532 So.2d 447 (1988)
Alma Bennett BACKHUS and Lawrence H. Backhus
v.
TRANSIT CASUALTY COMPANY, Bruce Boat Rentals, Inc., Placid Oil Company and Greyship Corp.
Nos. CA 87 0841, CA 87 1604.
Court of Appeal of Louisiana, First Circuit.
October 12, 1988.
*448 R. Scott Ramsey, Jr., Berwick, La., for Alma Bennett Backhus, et al., plaintiffs.
Messrs. Frank A. Piccolo & Daniel A. Webb, Abbott, Webb, Best & Meeks, New Orleans, La., for Placid Oil Co., defendant.
Dale Martin, Lippman Firm, Morgan City, La., for Bruce Boat Rentals, Inc., defendant.
Peter L. Hilbert, Jr., David Barnett, McGlinchey, Stafford, Mintz, Celleni & Land, New Orleans, La., for Greyship Corp., defendant.
Carey J. Guglielmo, Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, La., for La. Ins. Guar. Ass'n, defendant.
Nan M. Landry, Landry, Watkins & Bonin, New Iberia, La., for Teascorp Energy Services, Inc., defendant.
Robert A. Redwine, Sessions, Fishman, Rosenson, Boisfontaine, Nathan & Winn, New Orleans, La., for Angelina Cas. Co., defendant.
Before COVINGTON, C.J., and LOTTINGER and FOIL, JJ.
FOIL, Judge.
In this maritime personal injury suit, we are asked to decide whether the trial court was correct in entering summary judgment in favor of three defendants. Because we hold the dismissed defendants are not liable to the plaintiff as a matter of law, we affirm.

FACTS
Alma Backhus brought this maritime suit seeking damages under the Jones Act and general maritime law claiming she sustained injuries when she slipped and fell on the deck of the M/V Patricia Bruce. Plaintiff, who was a cook on board the Patricia Bruce at the time of the accident, is indisputably entitled to seaman status.
The Patricia Bruce was hired by Placid Oil Company to retrieve workover equipment from one of its platforms in the Gulf of Mexico and return it to shore. The vessel reached the platform on May 29, 1983, and loaded a snubbing unit owned by Tescorp Energy Services onto the rear deck of the vessel. The following day, the vessel arrived at the Placid Oil dock in Houma, Louisiana. Pursuant to her captain's orders, plaintiff left the vessel to purchase groceries. While she was gone, the workover equipment was offloaded from the vessel. Plaintiff claims upon her return, she crossed the rear deck of the ship and slipped and fell in a puddle of oil, thereby sustaining extensive injuries. According to the captain of the vessel, there was no oil on the deck prior to loading the equipment, and a puddle of oil was found after plaintiff reported the accident where a power pack for the snubbing unit had been.
Plaintiff brought this lawsuit on September 16, 1985, seeking damages under maritime law against the following defendants: Greyship Corporation [Greyship], the owner of the vessel; Bruce Boat Rentals [Bruce], plaintiff's employer and bareboat charterer of the vessel; Transit Casualty Company [Transit], Bruce's liability insurer; and Placid Oil Company. On December 3,1985, Transit was declared insolvent by a Missouri Court. Consequently, plaintiff brought the Louisiana Insurance Guaranty Association [LIGA] into the suit. Plaintiff also added Tescorp Energy Services and Angelina Casualty Company [Angelina], Bruce's umbrella liability insurer as defendants.
Greyship, Angelina and LIGA sought dismissal from the suit pursuant to motions for summary judgment. The trial court granted each motion, finding these defendants are not liable to plaintiff as a matter of law. This appeal followed, challenging the propriety of the trial court's action.

LIABILITY OF GREYSHIP
Plaintiff sued Greyship, the owner of the vessel, on theories of negligence and unseaworthiness. Greyship introduced considerable evidence in support of its motion for summary judgment. Plaintiff, however, offered nothing in opposition.
The evidence before the court on the motion for summary judgment can be summarized as follows: On December 21, 1981, Greyship and Bruce entered into a Bareboat *449 Charter Agreement in which Greyship agreed to transfer complete possession and control of the vessel to Bruce. Paragraph 6 of the agreement states, in pertinent part:
POSSESSION, USE AND OPERATION. (a) Charterer shall man, victual, fuel, maintain, navigate and supply the Vessel(s) at its sole cost and expense and shall pay all charges and expenses of every kind and penalties levied against the Vessel(s), it being understood that Owner retains no dominion, control, possession or command during the Term, all of the same being reserved to Charterer.
Bruce accepted delivery of the vessel directly from the ship's builder in early 1982 and was in exclusive possession of the vessel at the time of the accident. Greyship never had possession of the vessel and none of its employees ever worked on the vessel. The vessel was operated exclusively by the Bruce crew and the crew was not subject to Greyship's command. Further, Greyship's only interest in the vessel is as a financing entity: the corporation was established in order to finance purchases of vessels by its customers. Greyship retained title to the vessel solely as a security device.
The captain of the Patricia Bruce, a Bruce employee, attested it was the sole responsibility of the Bruce crew for maintenance and upkeep of the vessel, including cleaning the deck. He stated Bruce never received any instructions regarding the operation or upkeep of the vessel from Greyship. He also revealed the deck of the vessel had been cleaned shortly before the accident. The captain felt the snubbing unit had leaked oil onto the deck, accounting for the accumulation of oil there on the date of the accident.
Upon reviewing the evidence, the trial court ruled Greyship was not liable as a matter of law on either theory advanced by plaintiff. The court correctly ruled plaintiff could not establish negligence on the part of Greyship, as Greyship established it was not at fault in causing the accident. We therefore analyze the jurisprudence to determine whether the trial court correctly resolved the issue of liability based on unseaworthiness.
The trial court concluded a valid bareboat charter existed between Greyship and Bruce. The United States Supreme Court has held in order to create a bareboat charter, the owner must completely and exclusively relinquish "possession, command and navigation" of the vessel to the charterer. Guzman v. Pichirilo, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). Thus, control of the vessel becomes the crucial factor in determining whether a valid bareboat charter agreement exists. Because an owner may, under some circumstances, seek to use the bareboat charter as a shield against in personam liability, the courts have held the owner has a heavy burden to establish the existence of such an arrangement. See id, at 700, 82 S.Ct. at 1097; Complaint of Admiral Towing and Barge Co., 767 F.2d 243, 248 (5th Cir.1985). For a full discussion of the bareboat charter, see Admiralty Law Institute: Symposium on Charter Parties, 49 Tul.L.Rev. 743-806 (1975).
Greyship proved it relinquished possession and control of the vessel to Bruce both under the terms of the agreement and in fact. There was no evidence of any conduct on Greyship's part inconsistent with its expressed intent under the bareboat charter agreement. The evidence established Bruce had exclusive responsibility for operation, maintenance and upkeep of the vessel. Thus, we conclude Greyship successfully proved the existence of a valid bareboat charter arrangement and no factual dispute exists on this question. The remaining issue is the effect of the bareboat charter on Greyship's liability for unseaworthiness.
Under the federal jurisprudence, a bareboat charterer is considered as the owner pro hac vice of the vessel and all in personam liabilities arising out of the operation of the vessel are brought home to the charterer. Blanco v. United States, 775 F.2d 53, 58 (2d Cir.1985); T. Schoenbaum, Admiralty and Maritime Law § 5-3, at 168 (1987). As a general rule, an owner who has bareboat chartered his vessel owes a *450 duty to deliver a seaworthy vessel to the charterer. The federal courts have taken the position that the owner is liable only for unseaworthy conditions pre-existing the charter and bears no in personam liability for those conditions arising during the existence of the charter. See Brophy v. Lavigne, 801 F.2d 521 (1st Cir.1986); Kerr-McGee Corporation v. Law, 479 F.2d 61 (4th Cir.1973); In re Marine Sulphur Queen, 460 F.2d 89 (2d Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972); Haskins v. Point Towing Co., 421 F.2d 532 (3d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 66 (1970). In Complaint of Admiral Towing and Barge Co., 767 F.2d 243, 248 (5th Cir.1986), the Court stated "if a vessel is chartered bareboat, the owner may escape liability in personam for the condition or management of the vessel at least in some circumstances". (emphasis ours).
Plaintiff relies exclusively on a statement by the United States Fifth Circuit Court of Appeals indicating an owner may be liable for unseaworthy conditions arising during the existence of a bareboat charter. In Baker v. Raymond International Inc., 656 F.2d 173, 184 (5th Cir.1981), cert. denied, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed. 2d 861 (1982), the Court stated, "We make explicit what was implicit in The Barnstable: a seaman may have recourse in personam against the owner of an unseaworthy vessel, without regard to whether owner or bareboat charterer is responsible for the vessel's condition."
Plaintiff urges this court to follow Baker. We decline to do so. Not only is the position espoused in Baker contrary to the great weight of federal authority, its validity is called into serious question in the Fifth Circuit in light of Admiral Towing. Regardless of the status of the law in the Fifth Circuit, we follow the overwhelming federal authority in holding a vessel owner is not liable in personam for a transitory unseaworthy condition arising during the existence of a bareboat charter. The alleged unseaworthy condition in this case is clearly a transitory condition which arose during the existence of a valid bareboat charter. We therefore affirm the trial court's ruling Greyship is not liable as a matter of law.

LIABILITY OF ANGELINA CASUALTY COMPANY
The following facts are pertinent to the issue of Angelina's liability. Transit issued two policies of insurance providing protection to Bruce against claims by its maritime employees. The first, a Protection and Indemnity Policy (P & I), would indemnify Bruce for any sum it would be liable to pay for injury to "any person" as well as any "hospital, medical or other expenses necessarily and reasonably incurred in respect of ... injury to ... any member of the crew of a vessel named herein." The Patricia Bruce is a covered vessel under the policy. The second policy issued by Transit is a Standard Workmen's Compensation and Employers' Liability Policy (WC/EL). Coverage B, the Employers' Liability portion of the policy, covered all sums Bruce would be obligated to pay for injuries sustained by its employees arising out of and in the course of employment. Coverage B contained the following exclusion:
Such insurance shall not attach with respect to any liability of the insured if there is in force for the insured or for his benefit a protection and indemnity or similar policy or similar policy which would cover any part of such liability except for an "other insurance clause, deductible or limitation of liability clause or similar clauses." (emphasis ours).
Angelina issued an Umbrella Liability Policy to Bruce which listed the WC/EL policy, but not the P & I policy as an underlying policy. There is no excess insurer on the P & I policy.
Angelina sought dismissal from the suit on the basis of the exclusionary clause, contending the date of the accident is determinative of whether there was "in force" a protection and indemnity policy covering the plaintiff's claims. Angelina argued because the P & I policy issued to Bruce was "in force" on the date of the accident, the WC/EL policy was completely inapplicable *451 to plaintiff's claims and it therefore had no liability as an excess insurer. Plaintiff submitted, however, that the legally relevant date is the date of the judgment. On that date, plaintiff posited, the P & I policy would no longer be "in force" due to Transit's insolvency, the exclusionary clause would not be triggered, and the WC/EL policy would cover the plaintiff's claims. Plaintiff argued because the underlying policy would be applicable to her claims, Angelina as excess insurer would be liable even though the primary insurer was insolvent.
The trial court held the date of the accident, the date which gave rise to the cause of action, controlled the applicability of the exclusionary clause and found because there was a P & I policy "in force" on that date, the WC/EL policy provided no coverage at all for plaintiff's claims. The court ruled Angelina, as excess insurer, was not liable to the plaintiff as a matter of law. Alternatively, the trial court reasoned that even if the date of the judgment was controlling, the result would be the same, for on that date, neither policy would be "in force" and again Angelina would have no liability as an excess insurer.[1]
In challenging the trial court's ruling, plaintiff relies principally on this court's decision in Gros v. Houston Fire & Casualty Insurance, 195 So.2d 674 (La.App. 1st Cir.), writ denied, 250 La. 644, 197 So.2d 898 (1967). In Gros, this court was faced with the issue of whether the date of the accident or the date of the judgment controlled in deciding whether insurance was "valid and collectible" for the purpose of an excess insurer's obligation to pay. The policy at issue provided coverage would be "excess insurance over any other valid and collectible insurance." After the date of the accident, but before the date of judgment, the primary insurer became insolvent. The excess insurer contended the date of the accident controlled and on that date there was "valid and collectible insurance." This court disagreed, stating:
This court must hold, therefore, that the phrase "valid and collectable" with regard to the primary insurer is to be determined not by the conditions and existence of the time of the accident, but by those conditions existing at the time of judgment where the primary insurance policy is rendered uncollectable by reason of the insolvency of the insurer. id at 676-677.
We agree with Angelina's position that Gros is distinguishable and is not controlling on the issue presented in this case. The issue in Gros was the impact of the primary insurer's insolvency on the excess insurer's obligation to pay. The primary policy in Gros provided coverage for the claimants' demands and, but for the primary insurer's insolvency, it would have been called upon to pay. This case, however, presents the issue of which of two mutually exclusive primary policies provide coverage for the plaintiff's claims in the first instance. As the trial court noted, the language is unambiguous that, if the P & I policy covers the claim, the WC/EL simply does not. Thus, the language in the WC/EL policy mandates that we decide whether it provides coverage at all. We view this clause in the same manner as any clause in a primary policy excluding coverage. Such coverage questions have typically been controlled by the date of the accident, that is, the date on which the loss occurs. See Industrial Supply Co. of La. v. Transamerica Ins. Co., 220 So.2d 126 (La.App. 3d Cir.), writ denied, 254 La. 137, *452 222 So.2d 884 (1969). Therefore, we hold the date of the accident is determinative in resolving the coverage issue in this case. We conclude because the P & I policy was "in force" on the date of the accident, the exclusionary clause rendered the WC/EL policy totally inapplicable to the plaintiff's claims. Consequently, due to the inapplicability of the underlying primary policy, we hold Angelina is not liable as a matter of law.

LIABILITY OF LIGA
Having determined only the P & I policy is available to the plaintiff in this action, we must next decide whether Protection and Indemnity insurance falls under the "ocean marine insurance" exclusion so as to relieve LIGA from liability in this case.
In 1970, the Louisiana legislature set up the Louisiana Insurance Guaranty Association pursuant to La.R.S. 22:1375 et seq. to "avoid financial loss to claimants or policyholders because of the insolvency of an insurer ..." La.R.S. 22:1376. LIGA in effect steps into the shoes of the insolvent insurer to honor the claim. It is clear, however, that not all types of insurance fall within the scope of the act. La.R.S. 22:1377 specifically states that the act does not apply to "ocean marine insurance." The trial court held the "ocean marine insurance" exclusion applied in this case and ruled as a matter of law LIGA is not liable on plaintiff's claim.
The scope of the "ocean marine insurance" exclusion is a res nova issue in Louisiana. The lone effort by a Louisiana Appellate Court to decide its applicability was struck down by the Louisiana Supreme Court in Boudreaux v. LeBlanc Welding & Const., Inc., 515 So.2d 809 (La.App. 1st Cir.1987), rev'd, 519 So.2d 771 (La.1988). In Boudreaux, this Court held a Worker's Compensation and Employer's Liability Policy did not fall under the "ocean marine insurance" exclusion, upholding the lower court's grant of summary judgment in favor of the claimant. This Court reasoned the legislature intended to exclude only indemnity type insurance. The Supreme Court reversed and remanded "for trial on the merits and full development of the facts concerning liability." id.
Attempts to interpret the exclusion have caused so much confusion in the federal district courts and so many cases are pending which present the issue that the United States Fifth Circuit Court of Appeals has recently found it necessary to seek guidance from the Louisiana Supreme Court. In Deshotels v. SHRM Catering Services, Inc., 842 F.2d 116 (5th Cir.1988), the Fifth Circuit certified to our Supreme Court the question of whether a Worker's Compensation and Employer's Liability Policy, with a marine endorsement, falls under the "ocean marine insurance" exclusion.
Despite the lack of guidance on the extent of the exclusion, we believe the issue in this case is a pure question of law which this court must answer. We do not feel constrained by Boudreaux to remand this case for a full trial on the merits. While there may be some doubt whether the legislature intended to exclude Worker's Compensation and Employer's Liability insurance from the scope of the act, we are confident no such problem exists with respect to Protection and Indemnity insurance. Our survey of the literature in the area convinces us Protection and Indemnity insurance is beyond a doubt "ocean marine insurance."
Marine insurance is considered by the insurance industry as a type of transportation insurance, with the two principal divisions being "ocean marine insurance" and "inland marine insurance". The four most important types of "ocean marine insurance" are a) hull, b) cargo, c) freight and d) liability, known also as Protection and Indemnity insurance. Protection and Indemnity insurance is designed to protect the shipowner against liability incurred by reason of maritime perils, and provides coverage for injury to and death of crew members. D. Bickelhaupt, General Insurance 535-549 (10th Ed.1979); See also T. Schoenbaum, Admiralty and Maritime Law § 18-1, § 18-5, at 556-560, 566-568 (1987), classifying protection and indemnity insurance as "marine insurance" providing a shipowner with protection against liability *453 for personal injury to or loss of life of crew members. The literature further emphasizes that marine insurance is, in theory, a contract of indemnity. 1A. Parks, The Law and Practice of Marine Insurance & Average 21 (1987).
We conclude the trial court was correct in ruling Protection and Indemnity insurance constitutes "ocean marine insurance." Accordingly, we hold LIGA is entitled to judgment as a matter of law and was properly dismissed from this suit.

CONCLUSION
We hold the trial court correctly granted summary judgment in favor of Greyship, Angelina and LIGA, and we affirm that judgment. Costs of this appeal are assessed against the plaintiff.
AFFIRMED.
LOTTINGER, J., dissents and assigns written reasons.
DISSENTING OPINION
LOTTINGER, Judge.
For the reasons assigned by this writer in Boudreaux v. LeBlanc Welding & Construction, Inc., 515 So.2d 809 (La.App. 1st Cir.1987), rev'd, 519 So.2d 771 (La.1988), I respectfully dissent from the blanket holding by the majority that "ocean marine insurance" is excluded from LIGA coverage.
The reversal by the Louisiana Supreme Court of Boudreaux was on the question of the availability of summary judgment. Boudreaux was remanded by the Supreme Court "for trial on the merits and full development of the facts concerning liability,...."
NOTES
[1] The trial judge felt a determination of the controlling date was not crucial to the analysis of the application of the "in force" exclusionary clause. We disagree. Were this court to rule the date of the judgment controlled, an entirely different issue would be presented, that is, whether the excess insurer would "drop down" so as to provide primary coverage due to the insolvency of the primary insurer. See Gros v. Houston Fire & Casualty Ins. Co., 195 So.2d 674 (La.App. 1st Cir.), writ denied, 250 La. 644, 197 So.2d 898 (1967); Beauregard v. Salmon, 205 So.2d 634 (La.App. 2d Cir.1967); Poirrier v. Cajun Insulation Inc., 501 So.2d 800 (La.App. 4th Cir.1986), writ denied, 502 So.2d 579 (La.1987). It is entirely possible a different result would be reached. Thus, the question of the controlling date is squarely at issue in this case. Because we hold the date of the accident is determinative under the facts of this case, we need not decide the effect of an alternative ruling on Angelina's liability.